IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Nina Y. Wang

Civil Action No. 24-cv-02297-NYW

ASHFORD ARCHER,

    Petitioner,

v.

THE ATTORNEY GENERAL OF THE STATE OF COLORADO, and
SHANE STUCKER,

    Respondents.

---

**MEMORANDUM OPINION AND ORDER**

---

    Petitioner Ashford Archer ("Petitioner" or "Mr. Archer") is a convicted and sentenced state prisoner currently incarcerated at the Sterling Correctional Facility in Sterling, Colorado.  He is serving three criminal sentences after a jury convicted him of two counts of child abuse resulting in death and one count of accessory to a crime.  The sentences were imposed by the San Miguel County District Court in case number 2017CR28.  Mr. Archer brings this habeas corpus action under 28 U.S.C. § 2254 to challenge the child abuse convictions.  One claim remains for federal habeas review on the merits:  Mr. Archer's claim that the evidence presented at trial was insufficient to sustain his convictions for child abuse resulting in death.  After reviewing the application, the answer, and the state-court record, no basis for habeas relief has been shown.  For the reasons below, Mr. Archer's habeas application will be denied on the merits.

## STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") requires a prisoner

> who challenges (in a federal habeas court) a matter "adjudicated on the merits in State court" to show that the relevant state-court "decision" (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

*Wilson v. Sellers*, 584 U.S. 122, 124–25 (2018) (quoting 28 U.S.C. § 2254(d)(1)–(2)).  Mr. Archer's claim was adjudicated on the merits in state court.  As such, it is well-settled that "when the last state court to decide a prisoner's federal claim explains its decision on the merits in a reasoned opinion," a "federal habeas court simply reviews the specific reasons given by the state court and defers to those reasons if they are reasonable."  *Id.* at 125.  "[A] state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  *Harrington v. Richter*, 562 U.S. 86, 103 (2011).  Mr. Archer bears the burden of proof under § 2254(d).  *See Woodford v. Visciotti*, 537 U.S. 19, 25 (2002) (per curiam).

Because Mr. Archer proceeds pro se, the Court liberally construes his filings, but will not act as an advocate.  *James v. Wadas*, 724 F.3d 1312, 1315 (10th Cir. 2013).

## BACKGROUND

The Colorado Court of Appeals ("CCA") summarized the underlying factual background of this case in addressing Mr. Archer's direct appeal:

> Archer was part of an itinerant religious group that, in the summer of 2017, met Alec Blair by chance at a gas station east of Grand Junction.  Blair owned twenty acres of land near Norwood where he was attempting to grow

2

> vegetables and marijuana. The land was undeveloped and had no electricity, plumbing, power, or water rights, but, after getting to know some of the members of the group during their chance meeting, Blair invited them to stay there.
>
> When Archer and the others met Blair, their group was made up of . . . five adults and four children traveling in two vehicles. Codefendant Madani Ceus was the group's spiritual leader; she and Archer were the biological parents of two of the children. The other two children — the victims, who were approximately ten and eight years old — were the daughters of codefendant Nashika Bramble, another member.
>
> Blair's property had no permanent structures, so when the group arrived, they set up camp in tents, shacks, and their cars. Their spiritual beliefs were complex, but, as relevant here, they claimed to be "metaphysical healers" and sought spiritual purity by observing strict dietary rules and limiting personal possessions. Adhering rigorously to the group's rules was the only way that followers could acquire "light bodies" that would be able to enter heaven after the coming "purge."
>
> Although Ceus was the group's spiritual head, she did not make decisions on her own. Rather, according to Blair, a three-person "hierarchy" including Ceus and Archer "collectively as a unit ma[de] decisions for things."
>
> The victims died after they were banished to a vehicle in an isolated part of the property to work on their spiritual development. Ceus declared that the victims were no longer allowed to eat the food that she cooked, so on one occasion Blair and others gave them food that they had collected at a local food bank. But then Ceus barred anyone from leaving the property to obtain provisions, and no one gave the victims food, water, or other assistance again. They died some time later and, a month after that, Archer and Blair covered the car with a tarp to hide the bodies from law enforcement officers coming to the farm for periodic marijuana compliance checks.

[Doc. 10-5 at 3–5 (footnote omitted)]. The CCA affirmed Mr. Archer's convictions. [*Id.* at 20].

After the CCA affirmed Mr. Archer's convictions, he initiated this habeas corpus action under 28 U.S.C. § 2254. [Doc. 1]. On initial review, the Court ordered Mr. Archer to show cause why his Application for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 should not be dismissed as a "mixed petition"—a petition containing both

3

exhausted and unexhausted claims. [Doc. 11]. Because he had submitted a mixed petition, the Court advised Mr. Archer that he "may elect to amend his application to delete the unexhausted claims (Claims 2 and 4) and pursue in this action the claims which have been properly exhausted in state court (Claims 1 and 3)." [*Id.* at 9]. On January 2, 2025, Mr. Archer submitted the operative pleading, an amended Application for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254, [Doc. 14], deleting all claims except for Claim 1.

Mr. Archer's remaining claim is that the evidence presented at trial was insufficient to sustain Mr. Archer's convictions for child abuse resulting in death. [*Id.* at 7–9]. Respondents have answered the petition, contending that the CCA's resolution of the claim was not contrary to, or an unreasonable application of, clearly established federal law, which bars habeas relief under § 2254(d)(1). *See* [Doc. 22]. Respondents further argue that the state court's decision was not based on unreasonable factual findings, making relief unavailable under § 2254(d)(2). [*Id.*]. Mr. Archer has not filed a reply brief, and the time to do so has passed.

The Court now turns to the merits of Mr. Archer's claim.

## ANALYSIS

Mr. Archer claims that his child abuse convictions violate the Fourteenth Amendment because the prosecution did not prove all elements of the crime he was found to have committed. Mr. Archer argues that the "State did not prove that the inaction of the petitioner gave rise to any neglect on his part." [Doc. 14 at 8]. According to Mr. Archer, "[a]t no point during the trial did the State allege the Petitioner (1) caused an injury to the children or (4) his actions create an accumulation of injuries that ultimately result[ed] in death of child." [*Id.* at 7].

4

The Court will first recount why the CCA rejected Mr. Archer's claim and then address whether habeas relief is available under § 2254.

## I.  CCA's Rejection of the Claim

The CCA rejected this claim, finding sufficient evidence to support the jury's verdict on the two convictions for child abuse resulting in death. [Doc. 10-5 at 6]. Specifically, the CCA found as follows:

> A.  Sufficiency of the Evidence
>
> We first conclude that because the prosecution presented sufficient evidence to support the jury's verdict on the two charges of child abuse resulting in death, the trial court properly denied Archer's motion for judgment of acquittal.
>
> 1.  Standard of Review
>
> When a defendant challenges the sufficiency of the evidence, we review the record de novo to determine whether the evidence, viewed in the light most favorable to the prosecution, is substantial and sufficient to support the conviction beyond a reasonable doubt. *Dempsey v. People*, 117 P.3d 800, 807 (Colo. 2005). In doing so, we do not act as a thirteenth juror; whether we would have found the defendant guilty beyond a reasonable doubt based on the evidence presented is irrelevant. *Clark v. People*, 232 P.3d 1287, 1291 (Colo. 2010). Instead, the pertinent question for us is whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt when viewing the evidence in the light most favorable to the prosecution. *Id.*
>
> 2.  Act or Omission
>
> Under section 18-6-401(1)(a), C.R.S. 2021, a person commits child abuse if he
>
> causes an injury to a child's life or health, or permits a child to be unreasonably placed in a situation that poses a threat of injury to the child's life or health, or engages in a continued pattern of conduct that results in malnourishment, lack of proper medical care, cruel punishment, mistreatment, or an accumulation of injuries that ultimately results in the death of a child or serious bodily injury to a child.
>
> Archer contends that he did not engage in conduct prohibited by this statute,

and thus cannot stand convicted of child abuse resulting in death, because he (1) did not take any actions that injured the victims, and (2) had no special relationship with the victims that required him to take any action to save them from the neglect that he claims was the fault of their mother and others on the property.  We disagree with both arguments.

First, although the parties dispute whether Archer was required under section 18-6-401(1)(a) to intervene on the victims' behalf despite the fact that he was not their biological father, the prosecution presented substantial evidence that Archer did not simply fail to intervene; to the contrary, he engaged in affirmative acts of mistreatment, thereby rendering irrelevant the question of his relationship with the victims.  For example, as we have already discussed, there was evidence at trial that, as a member of the group's inner circle, Archer regularly participated in council meetings in which he, along with the other members, "collectively as a unit ma[de] decisions for things."  And although the girls' banishment and deprivation may have been pronounced by Ceus, there was ample evidence that it resulted from a collective decision in which Archer participated.  For example, Blair testified that Archer participated in conversations about the two girls during council meetings, and that Archer had not revealed to him that there were four children with the group, rather than three, until they had been on the property for nearly two months.  When he overheard a conversation about a fourth child, Blair asked Ceus and Archer about that child because no one had ever mentioned her to him and he had not seen her around the property.  After they "stepped aside and conferred," Archer "brought [Blair] over to the gray sedan[,] . . . opened up the door of the vehicle[,] and showed [Blair] that there were two children inside of the vehicle, one of [whom Blair] had never seen before."  This testimony supports an inference that the younger child had been confined to the vehicle for many weeks, during the summer, with Archer's full knowledge and participation, even before the group began to deprive her and her sister of food and water.

Moreover, Archer's actions led to Ceus's decree that the girls should be abandoned in the car.  For example, after Archer siphoned gas from the car, Ceus declared that he had "gray energy," and then "cleansed him by performing a blessing," but then "essentially ordered [the members of the group]" to stay away from the car.  Someone drew a "physical perimeter" around the vehicle that no one was allowed to enter, and the group then moved to another part of the property, leaving the victims to die.

Second, even if Archer had not affirmatively contributed to the conditions that led to the girls' deaths, and even if section 18-6-401(1)(a) does not broadly impose a duty to rescue,[2] there was ample evidence at trial showing that he was far more than an innocent bystander.  Indeed, he admitted to the investigating police officer that the girls had been placed in the car as

6

> punishment, and he was a leader of a nine-member group that had traveled around the country in two vehicles for years, moved to the Blair property together, and referred to itself as a "family" as it proselytized and attempted to recruit new followers like Blair. Under these circumstances, whether Archer had a formal familial relationship with the victims is beside the point. He was responsible, along with all the other adults, for the well-being of those children who were in the group's care.

[*Id.* at 6–11 (alterations in original)]. In a footnote, the CCA also observed that "[a]t least one division of this court has held that the statute *does* impose such a duty." [*Id.* at 10 n.2 (citing *People v. Arevalo*, 725 P.2d 41, 48 (Colo. App. 1986))]; *see also Arevalo*, 725 P.2d at 48 ("The statute refers to no external source of duty, and we do not believe the general assembly intended that a duty between an adult and a child [must] necessarily be established before a person may be charged with child abuse. The law is intended to prevent child abuse, and it applies to any person."). The CCA then considered whether the conduct was knowing or reckless:

> 3.   Knowing or Reckless
>
> The prosecution also presented sufficient evidence to establish that Archer's actions were knowing or reckless.
>
> As relevant here, child abuse requires that the defendant knowingly or recklessly causes serious bodily injury to a child. § 18-6-401(1)(a), (7)(a)(III). For most offenses, "knowingly" means that the defendant is aware that his or her conduct is practically certain to cause a particular result. § 18-1-501(6), C.R.S. 2021. And "recklessly" means that the defendant consciously disregards an unjustifiable risk that a result will occur or a circumstance exists. § 18-1-501(8). In other words, for most offenses, the mental states of knowingly and recklessly relate to the result of the conduct (often an injury to the victim).
>
> But child abuse is different. For this offense, the culpable mental states relate "to the nature of the offender's conduct in relation to the child or to the circumstances under which the act or omission occurred," not a particular injury to the child. *People v. Deskins*, 927 P.2d 368, 371 (Colo. 1996). Thus, "knowing" child abuse does not require that the defendant is aware that his conduct will cause serious bodily injury. Instead, to knowingly commit child abuse, a defendant need only be aware of the conduct he is

7

engaging in with the child. Similarly, to recklessly commit child abuse, a defendant need only consciously disregard a substantial and unjustifiable risk that, given the child's circumstances, the child may be injured. *Id.*

There was sufficient evidence that Archer acted knowingly or recklessly because, even though he was aware that the victims were confined to a car during the summer and then abandoned there without food or water, he did nothing to help them, and in fact he consciously disregarded the substantial risk that they would die as a result of being abandoned. Accordingly, the evidence presented at trial was sufficient to support Archer's convictions for child abuse resulting in death.

[Doc. 10-5 at 11–12].

## II.   Application of § 2254

Respondents answer that the CCA's decision did not contradict or unreasonably apply binding Supreme Court precedent, nor was it based on an unreasonable determination of the facts in light of the evidence presented, which spells the end of the claim under §§ 2254(d)(1) and (d)(2). The Court respectfully agrees.

The standard for evaluating a claim challenging the sufficiency of evidence is found in *Jackson v. Virginia*, 443 U.S. 307 (1979). In *Jackson*, the Supreme Court held that "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319. "This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Id.* "Under *Jackson*, federal courts must look to state law for 'the substantive elements of the criminal offense,' . . . but the minimum amount of evidence that the Due Process Clause requires to prove the offense is purely a matter of federal law." *Coleman v. Johnson*, 566 U.S. 650, 655 (2012) (per curiam) (quoting *Jackson*, 443 U.S. at 324 n.16). To the extent

8

an insufficient evidence claim involves an interpretation of state law, the state court's interpretation "binds a federal court sitting in habeas corpus." *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (per curiam).

"Sufficiency of the evidence is a mixed question of law and fact." *Maynard v. Boone*, 468 F.3d 665, 673 (10th Cir. 2006). The Court must apply both § 2254(d)(1) and § 2254(d)(2) and "ask whether the facts are correct and whether the law was properly applied to the facts." *Id.* The Court is "required to defer to any determination of factual issue by the state court due to the presumption of correctness afforded by § 2254(e)," unless Petitioner overcomes that presumption with "clear and convincing" evidence. *Id.* "*Jackson* claims face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference." *Coleman*, 566 U.S. at 651. "First, on direct appeal, it is the responsibility of the jury—not the [state] court—to decide what conclusions should be drawn from the evidence admitted at trial." *Id.* (quotation omitted). Second, "on habeas review, a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was objectively unreasonable." *Id.* (quotation omitted).

The CCA was not objectively unreasonable when it rejected Mr. Archer's sufficiency-of-the-evidence claim. As explained in the CCA's opinion, Colorado's child abuse statute may be violated under either a "caused injury" or "permitted injury" theory. Insofar as Mr. Archer's habeas application can be read to argue that the CCA misinterpreted Colorado's child abuse statute, the argument fails because this Court is bound to accept the CCA's conclusion regarding its interpretation of Colorado criminal

law. *Bradshaw*, 546 U.S. at 76 (holding that a state court's interpretation of its criminal law "binds a federal court sitting in habeas corpus").

Moreover, the evidence against Mr. Archer was sufficient for a rational jury to find him guilty under a "caused injury" or "permitted injury" theory. In affirming Mr. Archer's convictions, the CCA relied on evidence that:

- As a member of the group's leadership circle, Mr. Archer regularly participated in council meetings where he, along with other members, made collective decisions about the group, and specifically discussed the victims. [March 11, 2019, Trial Tr. at 94–96, 122–24]. This evidence supports a reasonable inference that Mr. Archer knew of and was at least partially responsible for the decision to banish the victims and deprive them of food and water.

- After being at the property for two months and never seeing the victims, Blair was taken to the children by Mr. Archer, where they were inside of a gray sedan. [March 11, 2019, Trial Tr. at 129–33].

- Mr. Archer siphoned gas from the gray sedan while the children were inside. After siphoning the gas, Mr. Ceus declared that he had "gray energy," cleansed him, ordered the members to stay away from the car, and a physical perimeter was drawn around the vehicle. The group then moved to another part of the property, leaving the victims to die. [March 11, 2019, Trial Tr. at 216–22]. Mr. Archer was aware that the victims were confined to a car during the summer, abandoned without food or water, and he did nothing to help them despite this knowledge.

- Mr. Archer admitted to the police that the girls had been placed in the car as punishment, and, as noted above, he was a leader of the group to which the victims were part of. [March 14, 2019, Trial Tr. at 67–68].
- After the victims died, Mr. Archer covered the car containing their bodies with a tarp to conceal them from law enforcement. [March 11, 2019, Trial Tr. at 35–38].

These facts are supported by the state-court record as indicated by the above citations. And Mr. Archer does not rebut the presumption of correctness with clear and convincing evidence of his own. *See* 28 U.S.C. § 2254(e)(1). When viewing the foregoing evidence as a whole, and in the light most favorable to the prosecution, the CCA reasonably concluded that a rational trier of fact could have found Mr. Archer guilty under either a "caused injury" or "permitted injury" theory of child abuse in violation of Colo. Rev. Stat. § 18-6-401(1)(a). *Vann v. Broaddus*, 349 F. App'x 265, 267 (10th Cir. 2009) (affirming denial of § 2254 habeas challenge where the petitioner challenged his child abuse convictions under Colo. Rev. Stat. § 18-6-401(1)(a) where the prosecution presented both theories of culpability, finding "the evidence . . . adequate to support the actual-abuse theory").

Mr. Archer resists this conclusion, maintaining that his inaction did not cause the children to die, that he had no "duty to rescue" the children, "or that he knew the mother had mistreated her children." [Doc. 14 at 8]. Evidence in the state-court record contradicts these arguments, and there was ample evidence presented that could lead a rational jury to conclude otherwise. In the end, it is the jury's responsibility "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. The fact that the jury weighed

the evidence against Mr. Archer is not a ground for habeas relief. The Court therefore finds that, under §§ 2254(d)(1) and (d)(2), the CCA got the facts correct and properly applied those facts to the law. Mr. Archer's claim will be denied.

## CONCLUSION

Mr. Archer points to nothing from the state criminal proceedings that qualifies as the sort of extreme malfunction in the state criminal justice system that § 2254 guards against. *See Richter*, 562 U.S. at 102. Accordingly, it is **ORDERED** that:

(1) The amended Application for a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 [Doc. 14] is **DENIED**, and this case is **DISMISSED WITH PREJUDICE**;

(2) Leave to proceed *in forma pauperis* on appeal be **DENIED WITHOUT PREJUDICE** to the filing of a motion seeking leave to proceed *in forma pauperis* on appeal in the United States Court of Appeals for the Tenth Circuit;

(3) A certificate of appealability pursuant to 28 U.S.C. § 2253(c) will not issue because Mr. Archer has not made a substantial showing of the denial of a constitutional right;

(4) The Clerk of Court is directed to close this case; and

     (5)    A copy of this Order shall be sent to:

>Ashford Archer, #185188
>Sterling Correctional Facility (SCF)
>P.O. Box 6000
>Sterling, CO 80751

DATED: January 2, 2026

BY THE COURT:

_____
Nina Y. Wang
United States District Judge